AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAMIEN PATRICK HOLLAND | DOCKET NO.<br><br>JAN 31 2017<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY                                DEPUTY<br><br>MAGISTRATE'S CASE NO.<br>17MJ00198 |

Complaint for violation of Title 18, United States Code, Section 1704

| NAME OF MAGISTRATE JUDGE<br>HONORABLE GAIL STANDISH | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>January 16, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1704]

On or about January 16, 2017, in Los Angeles County, within the Central District of California, defendant DAMIEN PATRICK HOLLAND knowingly possessed a counterfeit key suited to a lock adopted by the United States Postal Service and in use on an authorized receptacle for the delivery of mail matter, and defendant intended unlawfully or improperly to use, sell, or otherwise dispose of the key, in violation of Title 18 United States Codes Section 1704.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**JARROD RESENDEZ**         /s/ |
|---|---|
| | OFFICIAL TITLE<br>United States Postal Inspector |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br><br>GAIL J. STANDISH | DATE<br>January 31, 2017 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Bram Alden x3898          REC: Detention

## AFFIDAVIT

I, Jarrod Resendez, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is submitted in support of a criminal complaint and arrest warrant for Damien Patrick HOLLAND ("HOLLAND") for a violation of Title 18, United States Code, Section 1704 (Unlawful Possession of Counterfeit U.S. Postal Service Arrow Key).

2. This affidavit is also made in support of an application for a warrant to search one laptop computer and four cell phones seized by the Los Angeles Police Department ("LAPD") from HOLLAND on January 16, 2017, and currently in the custody of the United States Postal Inspection Service ("USPIS") in Los Angeles, California (the "SEIZED LAPTOP") and (the "SEIZED CELL PHONES"), as described more fully in Attachment A, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code Sections 1704 (Unlawful Possession of Counterfeit U.S. Postal Service Arrow Key), 1708 (Theft of Mail and Possession of Stolen Mail), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1028A (Aggravated Identity Theft), and 1029 (Fraud and Related Activity in Connection with Access Devices), as described more fully in Attachment B. Both Attachment A and Attachment B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel, witnesses, and victims. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR UNITED STATES POSTAL INSPECTOR JARROD RESENDEZ

4. I am a United States Postal Inspector employed by USPIS, Los Angeles Division, in Pasadena, California, and have been so employed since August 2010. I am currently assigned to the USPIS Pasadena Mail Theft Team, where my responsibilities include the investigation of crimes against the United States Postal Service, crimes related to the misuse and attack of the mail system, theft of the United States mail ("US Mail"), possession of stolen US Mail, and crimes related to the use, theft, or counterfeiting of postal keys (referred to as "arrow keys") and locks. As part of the Mail Theft Team, I investigate crimes in connection with access devices, including crimes related to credit and debit cards, identity theft, and unauthorized use of personal identifying information, as these criminal schemes have been known to be perpetrated through the US Mail.

2   Instrumentality Protocol

5. As part of my training as a United States Postal Inspector, I completed a twelve-week basic training course in Potomac, Maryland, which included training in the investigation of mail theft. I have also worked closely with, and learned from, other postal inspectors and federal agents who are experienced in investigating mail and identity theft cases.

### III. SUMMARY OF PROBABLE CAUSE

6. On January 16, 2017, LAPD officers involved in a drug investigation saw HOLLAND flee from a motel room through a bathroom window. Officers pursued HOLLAND and, after a short chase, caught him hiding under a vehicle. In his pants pocket, HOLLAND possessed a counterfeit United States Postal Service ("USPS") arrow key.

### IV. STATEMENT OF PROBABLE CAUSE

7. On January 16, 2017, LAPD Detective Jennifer Ward contacted me regarding HOLLAND's arrest. Based on my conversations with LAPD Detectives Ward and Stephanie Krajchir, and my review of LAPD reports, I know the following:

A. LAPD Dispatch

a. On or about January 16, 2017, LAPD officers were dispatched to a call of an "ambulance overdose" at 13022 Ventura Boulevard in Studio City, California. One of the subjects of the overdose told officers that he had obtained drugs from room 19 of the Park Motel located at 12963 Ventura Boulevard.

### B.   Flight and Arrest of HOLLAND

b.   LAPD Detective Jaime Martinez went to the Park Motel to inquire about room 19. As Detective Martinez walked into the motel, he observed two men, later identified as HOLLAND and Walter Guy ("Guy"), leave room 19, look around suspiciously, and enter room 22. Detective Martinez advised over his police radio that the individuals he observed were possibly involved in drug activity. Additional LAPD officers responded to the Park Motel to make contact with the occupants of rooms 19 and 22.

c.   Detective Martinez and LAPD Officers Olivia Diaz and Mario Majalca went to room 22 and knocked on the door. Dzhulyetta Petrosyan ("Petrosyan"), who was later identified as HOLLAND's girlfriend, answered. As Petrosyan opened the door, Officers Diaz and Majalca saw HOLLAND run into the bathroom of room 22. The officers requested everyone inside to exit the room. As Petrosyan, Guy, and an individual later identified as Robert Gomez ("Gomez") were exiting the room, the officers heard the sound of glass breaking in the bathroom that HOLLAND had entered.

d.   Officers Diaz and Majalca entered the room and opened the bathroom door, at which point they saw HOLLAND jump out of the broken bathroom window onto the roof of an adjacent building. The officers saw HOLLAND throw a small red briefcase onto the roof and run toward Ventura Boulevard.

e.   LAPD Officers John Bailey and Andreas An chased HOLLAND eastbound on Ventura Boulevard. HOLLAND ran into a rear alley behind the Western Bagel shop at 12930 Ventura Boulevard

and out of view of the officers. Officers entered the underground parking lot at 12930 Ventura Boulevard and were informed by witness S.K. that he had seen someone crawl under a silver Dodge pickup truck with California license plate number 8A13068.

   f.   When Officers Bailey and An located the Dodge pickup truck that S.K. had described, they found HOLLAND crouching next to the truck, breathing heavily, and sweating profusely. The officers detained HOLLAND without incident.

   g.   Officer An conducted a pat down search of HOLLAND and found a sharp object in HOLLAND's pants pocket. The object was a counterfeit USPS arrow key. HOLLAND was arrested, taken into LAPD custody, and transported back to the Park Motel while Officers Bailey and An searched the garage for additional evidence.

   C.   **Evidence Found Under the Dodge Truck**

   h.   Officer Majalca responded to the location of the silver Dodge pickup truck to assist Officers Bailey and An with the search for evidence. Hidden in the undercarriage of the Dodge truck, Officer Majalca found two wallets, which contained three California driver licenses and seven access cards, all in names other than HOLLAND. Officer Majalca also recovered three of the SEIZED CELL PHONES from the undercarriage of the vehicle.

   i.   Officer Majalca returned to the Park Motel with the recovered phones, and Detective Jaime Martinez showed the

                                      5            Instrumentality Protocol

phones to HOLLAND. HOLLAND stated that the phones were his.

### D. Interviews of PETROSYAN and GUY

8. Based on my review of the LAPD arrest report, I know the following:

    a. Officer Majalca informed Petrosyan of her <u>Miranda</u> rights, and she voluntarily participated in an interview during which she told the LAPD the following:

        i. Petrosyan and her boyfriend, HOLLAND, had been staying in room 22 of the Park Motel for approximately one week. Petrosyan paid cash for the room, which was registered to her friend Michael Brown, whom she had not seen in over a year.

        ii. Petrosyan knew that HOLLAND had a mailbox key and that he steals mail and commits identity theft.

        iii. Petrosyan does heroin and had smoked some earlier in the day. A lot of people would come to room 22 of the Park Motel in order to hang out and use drugs. Gomez and Guy were hanging out in the room, partying, and getting high, and they had spent the previous night there.

        iv. Petrosyan thought that HOLLAND jumped out of the window because of all the drugs and letters and because he has a daughter and did not want to go to jail.

    b. Officer Majalca informed Guy of his <u>Miranda</u> rights, and he voluntarily participated in an interview during which he told the LAPD the following:

    i.   GUY arrived at room 22 of the Park Motel at approximately 8:00 p.m. on January 15 and was there for three hours. GUY then went back to his rehabilitation facility and returned to room 22 on the morning of January 16.

    ii.   GUY went to room 22 to party, smoke marijuana, and get drunk.

    iii.   GUY knew that HOLLAND is involved in mail and identity theft.

  **E.**   **Evidence Found In and Around Room 22 of the Park Motel**

  9.   Based on my review of LAPD reports as well as my conversations with LAPD Detectives Ward, Krajchir, and Mike Dickson, I know the following:

    a.   All of the individuals found by the LAPD in rooms 19 and 22 of the Park Motel were advised of the nature of the LAPD's investigation into drug activity. Those individuals, including Petrosyan, Guy, and Gomez, all gave written consent to search rooms 19 and 22.

    b.   In room 22, LAPD officers found a men's jacket that was with other personal clothing items. Petrosyan told the LAPD that she and HOLLAND kept clothes in the area where the jacket was found.

    c.   Inside a pocket of the jacket were approximately five California drivers' licenses, one Thailand driver's license, one Mexican resident card, one Argentinian

7     Instrumentality Protocol

identification card, eight credit cards, one Visa debit card, three gift cards, three bus pass cards, two blank plastic cards with magnetic strips, one hotel card, and one NBC Universal employee ID badge. None of those items were in HOLLAND or Petrosyan's names.

    d. On the nightstand in room 22, officers found a partially made counterfeit USPS arrow key inside a plastic baggie.

    e. On a desk in room 22, officers found one pair of men's shoes with a shipping receipt not addressed to HOLLAND or Petrosyan, one debit card in a name other than HOLLAND or Petrosyan, one computer bag that contained a Dremel tool,[1] other miscellaneous tools, and a damaged Apple laptop ("SEIZED LAPTOP").

    f. In a drawer of the dresser in room 22, officers found a FedEx envelope that contained approximately 50 pieces of mail and mail matter in names other than HOLLAND or Petrosyan.

    g. On the roof of a building adjacent to room 22, officers found the red case that Holland had discarded when he fled. Inside the case, officers found mail addressed to persons other than HOLLAND or Petrosyan, one Social Security card in the

---

[1] A Dremel tool is a handheld power rotary tool. I know through my training and experience that a Dremel tool, combined with attachments, can be used to shave metal pieces into counterfeit arrow keys.

name A.G., and approximately thirteen blank checks.

    h.  On the television stand in room 22, officers found a white Samsung cell phone, the fourth SEIZED CELL PHONE, with a cracked screen.

**F.    EXAMINATION OF USPS ARROW KEY**

    10.  On January 17, 2017, I retrieved the counterfeit arrow key that the LAPD found in HOLLAND's pants pocket. Based on my training and experience, I immediately identified the key as a counterfeit arrow key. The key was made from shaved metal that appeared to be melted to a plastic handle. I compared the counterfeit arrow key to a genuine "236" arrow key and determined that the counterfeit key was almost an exact match and thus would be capable of opening USPS "236" series arrow locks.

    11.  On January 23, 2017, I tested the counterfeit arrow key that the LAPD found in HOLLAND's pant pocket on a genuine USPS "236" series arrow lock and successfully opened the lock.

    12.  I know from my training and experience that the "236" series of USPS arrow locks are assigned to numerous neighborhood delivery collection box units throughout the city of Los Angeles and possessing a counterfeit "236" arrow key would give an individual illegal access to those mailbox units.

## V. TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

13. Based on my training and experience, including being a member of the USPIS Mail Theft Team, and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

   a. Persons involved in mail theft and identity fraud typically obtain the checks and personal information they seek by stealing the mail of victims, or from co-conspirators who have done these things.

   b. Persons who steal mail are often involved in identity theft crimes. These individuals usually steal mail looking for access devices and other personal identifying information that they can use to fraudulently obtain money and items of value. It is common practice for individuals involved in mail theft, access device fraud, and identity theft to use and maintain digital devices. These digital devices include, but are not limited to, thumb drives, memory chips, flash drives, computers, tablets, and cellphones. These individuals use such devices to store information about their identity theft crimes during and long after the crimes have been committed. This information can include, but is not limited to, the following: logs of fraudulent transaction history; records of funds received; information regarding individuals and companies that have been victimized; records of payments from co-conspirators; and victim profiles. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or

state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

    c.    Mail and identity thieves oftentimes use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically on the internet. These individuals employ digital devices for purposes of, among other things, (i) applying online for fraudulent credit cards, (ii) obtaining personal identification information for the purposes of establishing or modifying fraudulent credit card accounts, (iii) using fraudulently obtained credit cards to make purchases, (iv) manufacturing counterfeit identification, credit cards, and checks, and (v) keeping records of their crimes.

    d.    Individuals who participate in these schemes often maintain telephone numbers and other contact information of their co-conspirators in order to facilitate their crimes together. Oftentimes they maintain the contact information in their computers, tablets, cellular telephones and other digital devices.

    e.    Based on my training and experience, I know that individuals who participate in these schemes often work with co-conspirators to collect and use personal identifying and account information of their victims. These individuals often communicate by phone, e-mail, and text message, sometimes exchanging information and photographs related to their crimes.

## VI. TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES

14. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

   a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

   b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

   c. While it is difficult to estimate the precise storage space contained on the devices listed in Attachment A prior to conducting any kind of examination, based on my

training and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I believe that the devices listed in Attachment A contain at least one gigabyte of storage space. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

    d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently

downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

       e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal

information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

      g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including

the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

  h. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

  15. For all the reasons described above, there is probable cause to believe that HOLLAND violated Title 18, United States Code, Section 1704 (Unlawful Possession of a Counterfeit U.S. Postal Service arrow key).

16. Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the offenses described in Attachment B will be found on the digital devices described in Attachment A.

/s/
_____
JARROD RESENDEZ
Postal Inspector, United
States Postal Inspection
Service

Subscribed to and sworn before me this 31st day of January 2017.

GAIL J. STANDISH
_____
HONORABLE GAIL STANDISH
UNITED STATES MAGISTRATE JUDGE